UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DALE A. NEASON,

              Plaintiff,

     -vs-

Captain BIENKO, Lieutenant PYJAS,
Sergeant GREEN, Superintendent
LIVINGSTON, JANE DOE #1, JANE DOE
#2 and JANE DOE #3,

              Defendants.

**DECISION AND ORDER
No. 09-CV-6327(MAT)**

---

## I. Introduction

In this action commenced pursuant to 42 U.S.C. § 1983, pro se plaintiff Dale A. Neason ("Neason" or "Plaintiff") alleges that while he was incarcerated at the Erie County Holding Center ("ECHC") and the Erie County Correctional Facility ("ECCF"), defendants were deliberately indifferent to his serious medical needs and his safety in violation of the Eighth Amendment to the United States Constitution. Plaintiff was released to parole subsequent to the filing of this action.

Defendants have moved for summary judgment dismissing the Second Amended Complaint, the operative pleading in this case. The matter was transferred to the undersigned on October 3, 2012. For the reasons discussed below, Defendants' First Motion for Summary Judgment is granted, and the Second Amended Complaint is dismissed.

## II. Factual Background

Unless otherwise noted, the following facts are undisputed, and are derived from the parties' statements pursuant to FED. R. CIV. P. 56.1, affidavits and declarations, and other submissions.

### A. The Parties

Plaintiff was an inmate at ECHC and ECCF during all times relevant to this lawsuit. Defendant Superintendent Livingston was, at all relevant times, the First Deputy Superintendent of the Erie County Sheriff's Office, Jail Management Division ("JMD"), responsible for the day-to-day operations of ECCF. Defendant Captain Bienko ("Bienko") was and is a Captain with the Erie County Sheriff's Office JMD and, at all relevant times, was assigned to ECCF. Defendants Lieutenant Pyjas and Sergeant Green were at all relevant times, officers with the JMD. The Jane Doe defendants have not been identified by Plaintiff.

### B. Plaintiff's Mental Health Treatment

Neason entered ECHC on February 21, 2009. On February 24, 2009, Coralyn Hunter, M.S. ("Hunter") performed an initial screening assessment and concluded that Neason was maintaining his competency and stability, and thus he was capable of living in general population at ECCF.

On March 5, 2009, Hunter and Psychiatric Nurse Practitioner Ellen Riley ("Riley") met with Neason, who was complaining of having difficulty sleeping and anxiety. Riley prescribed Trazodone

(50 mg) to address the sleep issues and Lexapro (10 mg) to address the anxiety symptoms. On March 19, 2009, Neason returned for his follow-up appointment, complaining of continued sleeping impairments and a general depressed mood. Riley increased Neason's dosage of Lexapro to 20 mg and increased his dosage of Trazodone to 100 mg.

On April 2, 2009, Neason returned for his follow-up appointment, at which time he offered no complaints and indicated his sleeping and mood had improved and he was feeling calmer. Neason's medications were continued unchanged, and he was scheduled for a follow-up visit in four weeks. On April 30, 2009, Neason stated to Riley and Hunter that he was doing "a lot better" but had begun perspiring excessively at night. Riley discontinued the Trazodone and started him on Remeron (15 mg).

At his follow-up appointment on May 21, 2009, Neason reported that his sleeping had been uninterrupted and his perspiration had decreased since discontinuing the Trazodone. Riley increased the dosage of Remeron to 30 mg and maintained the dosage of Lexapro. Hunter scheduled Neason for a follow-up visit in approximately three weeks.

On May 24, 2009, Neason was transferred to ECCF. On May 27, 2009, Bonnie McLaughlin, M.S., L.M.H.C. ("McLaughlin"), performed an initial screening assessment. When Neason saw McLaughlin and psychiatrist Evelyn Coggins, M.D. ("Dr. Coggins"), he indicated

that he was having continued difficulty sleeping. Dr. Coggins decreased the Lexapro dosage from 20 mg to 10 mg and left his Remeron dosage unchanged.

At his follow-up appointment on July 14, 2009, with Dr. Coggins, Neason indicated he was still having difficulty sleeping. Dr. Coggins discontinued the Lexapro and increased the Remeron dosage to 45 mg. Neason returned to see Dr. Coggins on August 17, 2009, at which time he reported feeling "unbalanced" and "down" with low energy. Dr. Coggins decreased the Remeron to 30 mg and prescribed Pristiq at 50 mg to address his symptoms of depression.

At his follow-up appointment on September 3, 2009, Neason reported continued trouble sleeping and concern related to his criminal charges. Dr. Coggins increased the Pristiq from 50 mg to 100 mg and decreased the Remeron from 30 mg to 15 mg. Dr. Coggins scheduled Neason to return for a follow-up appointment in approximately four weeks.

Following a threatened attempt to escape, Neason was reclassified as a security risk and accordingly was transferred from ECCF, a medium security facility, back to ECHC, a maximum security facility. After he returned to ECHC, Hunter and Riley resumed treatment of Neason until his transfer to the custody of New York State Department of Corrections and Community Supervision on February 18, 2010. During this period, Neason's dosage of

Pristiq was decreased from 100 mg to 50 mg and ultimately discontinued at Neason's request on February 4, 2010.

### C. Medical Treatment

Upon admission to ECCF, Neason was examined by a nurse from the medical department who noted that Neason had been diagnosed with glaucoma for which he applied eye drops in the morning. Neason was currently receiving various medications including Norvasc (amlodipine) (10 mg), which is used to treat high blood pressure. At the conclusion of her examination, the nurse faxed a request to ECHC for confirmation of the prescriptions, including Norvasc.

On May 26, 2009, physician's orders were entered for both amlodipine and Xalatan (eye drops to treat glaucoma). Each prescription was for a ninety-day supply of the medications. On June 15, 2009, Neason was examined by Stephen Swain ("Swain"), a physician's assistants at ECCF. Swain noted that Neason was getting all of his necessary medications.

On June 24, 2009, Neason was examined in the medical unit at ECCF, and a ninety-day prescription for hydrochlorothiazide was ordered to augment the treatment of Neason's chronic hypertension.

On June 29, 2009, Neason was examined in the medical unit by Swain at which time Swain diagnosed conjunctivitis in Neason's left eye. Swain prescribed a seven-day supply of Polytrim antibiotic eye drops. On July 21, 2009, Neason presented in ECCF medical unit complaining of an earache in his right ear and discomfort in his

left eye. A prescription for Cortisporin was ordered to treat Neason's earache. With respect to his eye-related complaints, Neason was referred to the Ross Eye Clinic ("the Clinic"), a private clinic not affiliated with ECCF. Also during this visit, a refill for the Xalatan eye drops was ordered.

On July 22, 2009, at 10:30 a.m. Paulette Hill ("Hill"), a nurse from ECCF, called the Clinic to schedule Neason's referral appointment. No one answered at the Clinic and Hill left a voicemail message. When she failed to receive a call back, Hill called the Clinic again on July 23, 2009, at 10:05 a.m. Hill spoke with a receptionist who informed her that Anne, the nurse who schedules appointments, was out of the office until Monday, July 27, 2009. The receptionist requested that Hill call back then.

Hill called the Clinic on July 27, 2009 at 1:00 p.m. as instructed and spoke with Anne. Hill's notes indicate that Anne would call her back with a date and time for Neason's appointment. After not receiving a call back from Anne, Hill called the Clinic for a fourth time on July 29, 2009, at 11:30 a.m. Finally, on August 3, 2009, Hill spoke with Anne who confirmed that Neason had been scheduled for an appointment on August 25, 2009, at 8:30 a.m.

Meanwhile, on July 27, 2009, and July 31, 2009, while Hill was attempting to schedule Neason's appointment with the Clinic, Neason was examined twice in ECCF medical unit. On both occasions, the

clinician who examined Neason noted that he was using Xalatan eye drops to treat his glaucoma.

On August 25, 2009, Neason was seen at the Clinic for a consultation at which artificial tears were prescribed to assist with the lubrication of Neason's eyes. His prescription for Xalatan eye drops remained unchanged.

Neason was transferred to ECHC on or about September 10, 2009, following a threatened escape attempt. While in the custody of the Erie County Sheriff, Neason was evaluated and treated for medical issues, including, but not limited to glaucoma, high blood pressure, and conjunctivitis. See Declaration of Edwin Heidelberger, M.D., Ph.D., ¶¶ 20-23.

**D. Allegations in Plaintiff's Second Amended Complaint**

In his Second Amended Complaint (Dkt #6-2), the operative pleading in this case, Plaintiff asserts that Sergeant Green denied him the proper medical care "by refusing [him] a grievance and not looking into [his] medical problem." Dkt #6-2 at 5. He alleges that Lieutenant Pyjas "refused to correct the wrong by having [him] transferred back to" the facility where he wanted to be housed, ECHC. Id. Plaintiff asserts that he is "not to be housed" at ECCF, and that he does not receive the proper medical care at ECCF. Id. at 7, 9. He also contends generally that his safety is at risk at ECCF, and specifically alleges several incidents in which Defendants failed to protect him from harm.

Plaintiff alleges that he was denied medical treatment "for eyes and mental Health by Jane Doe #1, Jane Doe #2, Jane Doe #3." Id. Specifically, he contends that he was supposed to have his eye drops administered by a nurse. Id. at 7. In addition, he asserts that the "doctor has been experimenting on [him] with different types of medications." Id.

Plaintiff asserts that Captain Bienko "forced [him] to sign off on [a] Grievance which never got Processed. . . ." Id. at 5. He also asserts that Bienko, Pyjas, and Green "conspired to cover-up" the alleged constitutional violations. Id.

### D. Defendants' First Motion for Summary Judgment

On February 28, 2011, Defendants filed their First Motion for Summary Judgment, arguing that Plaintiff has failed to raise a material issue of fact as to whether any of the defendants acted with deliberate indifference; that the non-medical defendants lacked the requisite personal involvement; and that all defendants are entitled to qualified immunity. Plaintiff unsuccessfully moved to have counsel appointed, but he has not opposed the summary judgment motion.

## IV. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has carried its burden, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## V. Title 42 U.S.C. § 1983

In order to maintain a section 1983 action, "two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, *549 (2d Cir. 1994) (citations omitted). To bring a § 1983 claim against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to assert that the defendant is a "link in the prison chain of command." McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (quotation omitted); see also Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

**VI. Analysis of Plaintiff's Eighth Amendment Claims**

    **A.    General Legal Principles**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend VIII; see also, e.g., Estelle v. Gamble, 429 U.S. 97, 101 (1976). To establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove that the prison official acted with the subjective mental state of "deliberate indifference" to the prisoner's objectively "serious medical needs." Id. at 104; accord, e.g., Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011). "The standard for deliberate indifference includes a subjective component and an objective component." Hill, 657 F.3d at 122 (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (per curiam)).

Subjectively speaking, the official charged with deliberate indifference must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The objective prong of the test requires the alleged deprivation to "be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted).

**B. Deliberate Indifference to Plaintiff's Medical Needs**

It is clearly established that "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." Hill, 657 F.3d at 123 (citing Estelle v. Gamble, 429 U.S. 97, 106-07 (1976); Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998); see also Jackson v. Fair, 846 F.2d 811, 817–18 (1st Cir. 1988) (no claim of deliberate indifference to serious medical needs when prisoner transferred from high security psychiatric hospital to general prison population of another institution, because treatment at new facility was adequate and prisoner did not have right to treatment of his choice).

Neason's second amended complaint "falls far short of alleging a deliberate indifference on the part of" any of the medical defendants "to his serious medical needs." Hill, 657 F.3d at 123. As Defendants point out, while Neason was incarcerated at ECHC and ECCF between February 21, 2009, and February 18, 2010, he was examined by either a psychiatric nurse practitioner or a psychiatrist on approximately twenty separate occasions. With regard to his non-psychiatric complaints, Neason received appropriate treatment at all relevant times from licensed, qualified mental health professionals and medical doctors. When Defendants found that Neason required treatment beyond that which they could provide, they arranged to have him seen by an outside specialist. All of Neason's concerns were addressed and his

medications constantly were adjusted to treat his symptoms. "Inmates have no 'right' to dictate the type of procedure that must be utilized in a particular instance[,]" and therefore Plaintiff's "personal opinion concerning the nature and quality of care is of little value in determining whether there has been a constitutional violation concerning his medical care." Ross v. Kelly, 784 F. Supp. 35, 45 (W.D.N.Y. 1992).

Plaintiff's allegations that prison doctors were "experimenting" on him is wholly speculative and unsubstantiated. "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. N.Y., 316 F.3d 93, 100 (2d Cir. 2002)(citing Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532-33 (2d Cir. 1993); FED. R. CIV. P. 56(e)). Likewise, his contention that he is not receiving treatment for his glaucoma is contradicted by his medical history, recounted above, which demonstrates that he received consistent, regular care and was prescribed an appropriate medication for his condition. Dr. Heidelberger states that there was no medical reason that prevented Neason from applying his own Xalatan eye drops, and accordingly, it was not medically necessary to have a nurse apply the aforementioned eye drops. Defendants' Appendix ("Defs' App."), Exhibit ("Ex.") F, ¶¶ 22 (Dkt #29-7). Thus, the Court finds Neason's contention that he was entitled to the special treatment

of having a nurse administer the eye drops for his glaucoma to be patently frivolous.

Neason also asserts that he was not receiving the "proper" blood-pressure medication. This claim "amount[s] to a mere disagreement with prison medical personnel concerning the appropriate course of treatment and level of care that he should receive[,]" Ross v. Kelly, 784 F. Supp. 35, 45 (W.D.N.Y.), aff'd ___Fed. Appx. ___, 970 F.2d 896 (Table) (2d Cir. 1992), which "does not constitute a constitutional violation." Id.; see generally, Chance, 143 F.3d at 703.

"Because Plaintiff has not produced any evidence demonstrating more than a possible disagreement about treatment options, he has not shown the subjective component of his claim of deliberate indifference." Alexander v. Galeno, No. 07 Civ. 9662(RMB), 2011 WL 1793266, at *3 (S.D.N.Y. Apr. 25, 2011) (citing, inter alia, Whitfield v. O'Connell, No. 09 Civ.1925, 2010 WL 1010060, at *7 (S.D.N.Y. Mar. 18, 2010) (quoting Estelle v. Gamble, 429 U.S. at 106 ("Disagreements over medications, diagnostic techniques, [or] forms of treatment, . . . are not adequate grounds for a § 1983 claim.")). Since the Court finds that Plaintiff has not shown the subjective component of a deliberate indifference claim, it need not consider whether Plaintiff has shown a dispute of fact as to the objective component. See Johnson v. Goord, No. 01 Civ. 9587, 2004 WL 2199500, at *6 (S.D.N.Y. Sept. 29, 2004) (analysis of

-13-

objective component immaterial where Plaintiff "ha[s] failed to come forward with admissible evidence sufficient to create a triable issue of fact on the subjective prong"); accord Alexander, 2011 WL 1793266, at *3 n. 11.

**C. Deliberate Indifference to Plaintiff's Safety**

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. N.Y. City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996) (citation omitted). For a claim based on the failure to prevent harm, the inmate first must show that "he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 832 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). Second, the inmate must show that prison officials acted with "deliberate indifference" to his safety. Hayes, 84 F.3d at 620 (citing Morales v. N.Y. State Dep't of Corrs., 842 F.2d 27, 30 (2d Cir. 1988)).

Here, as Defendants argue, Neason has failed to come forward with any evidence suggesting that he was incarcerated under conditions posing a "substantial risk of serious harm[,]" Farmer, 511 U.S. at 532. Neason asserts without record support that he was "not to be housed" at ECCF. However, as set forth in the Declaration of Coralyn Hunter, M.S., at the time of his transfer to ECCF in May of 2009, Neason was competent and mentally stable, and was capable of living in general population. Thus, there were no

-14-

mental health concerns preventing Neason from being housed at ECCF. See Defs' App. Ex. A, ¶ 4 (Dkt #29-2). Moreover, Dr. Heidelberger found that from a medical perspective, it was appropriate to house Neason at ECCF during the relevant time period. See Defs' App. Ex. F, ¶ 5 (Dkt. #29-7).

Finally, there was no security-related reason for Neason not to be housed at ECCF during the relevant time period. As set forth in the Declaration of Sergeant Joseph Usinski ("Usinski"), in early November 2008, Neason was housed at ECHC. Once he was sentenced, he was transferred to ECCF. ECCF is a medium security facility comprised of two types of housing units-dorm and podular. A dorm style unit consists of one large room with multiple bunk beds contained therein; inmates eat, socialize and sleep in that one room. A podular unit consists of one common area with individual rooms connected to it; inmates eat and socialize in the common area and sleep in the individual rooms. See Defs' App., Ex. C, ¶ 2 (Dkt #29-4).

Due to discipline problems, however, Neason was returned to ECHC, higher-security facility, on November 12, 2008, at which time he was assigned to a more restrictive housing unit, namely, a linear style unit consisting of a row of individual cells with metal bars. Defs' App., Ex. C, ¶ 3 (Dkt #29-4). As a result of Neason's disciplinary problems, and contemporaneously with Neason's transfer, Usinski entered a message into the JMD's computer system

indicating that Neason was not to be housed at ECCF at that time. Other than Neason's disciplinary issues, there was nothing precluding Neason from being housed at a lower-security facility such as ECCF. Had there been a medical or mental health reason for not housing Neason at ECCF, the Medical or Mental Health Departments would have entered the notation in the JMD's computer system. Id., ¶ 7 (Dkt #29-4).

By entering the message into the JMD's computer system on November 12, 2008, indicating that Neason was not to be housed at ECCF during his November 2008 incarceration, Usinski did not intend that Neason could never be housed at ECCF. Id., ¶ 8 (Dkt #29-4). In fact, in February 2009, when Neason was arrested again and booked at ECHC, he was assigned to a podular housing unit, the less restrictive type. Id., ¶ 9 (Dkt #29-4). Because Neason was stable during this time period and did not have any disciplinary issues, he was transferred on May 24, 2009, to a podular unit at ECCF where he remained until September 10, 2009. Id.

Based upon the forgoing, it is clear that Neason was not incarcerated under conditions posing a substantial risk of serious harm. Neason was appropriately housed according to his classification and there were no medical or mental health reasons that Neason could not be housed at ECCF between May 24, 2009, and September 10, 2009.

Neason also points to three alleged incidents demonstrating that the corrections officers were deliberately indifferent to a substantial risk of harm posed to him at ECCF. In particular, Neason asserts that (1) he fell in the shower, (2) was spit on by an unidentified inmate, and (3) had feces thrown on him by another unidentified inmate. He states that ECCF administration has "done nothing" about the spitting or the feces-throwing. Dkt #6-2 at 9.

Neason has not come close to satisfying his burden at the summary judgment stage. With regard to the shower incident, Neason has not set forth any facts tending to show that Defendants were aware of substantial risk that he would be harmed in the shower or that they acted with a callous disregard of his safety. Moreover, Neason did receive medical treatment for the injury he sustained in the shower. With regard to the incident of being spit upon by another inmate, he has not alleged even a de minimis injury. See Sheils v. Rock, 9:04CV861(LEK/GJD), 2008 WL 907320, at *9 (N.D.N.Y. Mar. 31, 2008) ("The fact that [corrections officers] may have spit tobacco on plaintiff [inmate], although vulgar and inappropriate, would not rise to the level of a constitutional violation."). Finally, with regard to the incident of feces-throwing by another inmate, such incidents unfortunately are a regular part of prison life. See Porter v. Selsky, 287 F. Supp.2d 180, 186 (W.D.N.Y. 2003). Neason has not established more than a de minimis injury, or that Defendants were aware of a substantial risk of harm posed by the unidentified inmate. Furthermore, there is no allegation that

-17-

he was subjected to repeated harassing conduct. Accordingly, the Court finds that Neason has failed to raise a triable issue of fact with regard to his failure-to-protect claim.

**VII. Pendent State Law Claim**

Defendants have interpreted Plaintiff's Second Amended Complaint as asserting a cause of action under New York state law, and they argue that the claim must be dismissed because Plaintiff failed to comply with N.Y. County Law § 52 and N.Y. General Municipal Law § 50-e(1) by filing a notice of claim. Assuming that Plaintiff has raised a state-law claim, the Court finds that it should be dismissed since the Court has dismissed all of the federal claims with prejudice. See Marcus v. AT & T Corp., 138 F.3d 46, 57 (2d Cir. 1998) (Under 28 U.S.C. § 1367(c)(3), it is well settled that "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

**VIII.    Conclusion**

For the foregoing reasons, Defendants' First Motion for Summary Judgment (Dkt #27) is granted, and Plaintiff's Second Amended Complaint (Dkt #6) is dismissed in its entirety. The Clerk of the Court is directed to close this case.

    **SO ORDERED.**

                              S/Michael A. Telesca
                              _____
                              HONORABLE MICHAEL A. TELESCA
                              United States District Judge

DATED:    Rochester, New York
          October 5, 2012